(Licking County, O., Common Pleas Court.)
April, 1897.

JONATHAN V. HILLIARD, ADMR., ETC. v. CARRIE SANFORD, et al., JONATHAN V. HILLIARD, ADMR. v. JACOB ROBERTS.

---

*Life Insurance—Insurable interest of grand-father in life of grand-son—*

Where the relation is such that it constitutes a good and valid consideration, in law, for a gift or grant, an insurance policy will be entirely free from any imputation of a wager. A grandfather has therefore an insurable interest in the life of his grandchild.

*Life insurance policy forced on party as a device of usury—*

Where a Life Insurance Co., in making a loan to an applicant therefor, at the same time requires such applicant to take out a life insurance policy with the condition that if any of the interest notes is not promptly paid when due, such policy shall be sold at their office, in Cincinnati, far away from the place of residence of the insured, without any notice thereof, excepting a letter directed to the insured, such transaction is unconscionable and a mere device to extract usurious compensation from the borrower of the money, and such insurance is void.

---

JONES, J.

In the case of Jonathan V. Hilliard, as administrator of the estate of John Strawn, deceased, v. Carrie Sanford et al., No. 9703, and the case of Jonathan V. Hilliard, Adm'r. v. Jacob Roberts, No. 8972.

The first case is on appeal here from probate court. The second is a suit brought in this court originally. The second case— the one of Jonathan V. Hilliard v. Jacob Roberts, is brought in this court upon a promissory note, dated April¹, 1892, originally for $2.281, being balance of purchase money of the sale of sixty-nine and one-half acres of land by John Strawn to Roberts. Such payments have been made on the note so as to leave a balance due of $1,603.60, with interest at seven per cent. from August 28,1894.

In the answer, Jacob D. Roberts alleges that this note was given for the purchase

money of sixty-nine and one half acres bought from John Strawn, conveyed by warranty deed, containing covenants against incumbrances and warranty. That at the time of the execution of the deed, there were on this sixty-nine and one half acres, and four other parcels containing 173 acres, three mortgages, executed May 30, 1889, by Strawn, to secure The Union Central Life Insurance Company the payment of four principal notes, one for $10,500, due in five years, and four for $500, due in one, two, three and four years from May 30, 1889, with interest coupons attached to each for the annual interest, being interest on the principal sums at seven per cent. ; and the other mortgage to the insurance company, on the same land, to secure the payment of four notes of $532, due successively each year, and to bear interest after maturity at eight per cent. The third mortgage, to Jonathan V. Hilliard, for $450, with interest. That the existence of these mortgages was a breach of the above named covenants; that John Strawn died seized of 173 acres; and that it had been sold by proceedings by Strawn's administrator in the probate court, the proceeds of which sale were insufficient to pay he mortgages. That he is entitled to have the moneys arising from the sale of 173 acres applied to the payment of the mortgages, and that any amount remaining unpaid thereafter, and which he would be compelled to pay to discharge the mortgage lien, should enure as a counter-claim to him against the note—that is, the note sued on in this suit of Jonathan V. Hilliard v. Roberts. He further avers that defenses have been made by him and the heirs of Strawn, affecting the amount due the insurance company in the case in the probate court, which case was in this court by appeal from the probate court, and asks that judgment should not be rendered in this case until the amount due should be ascertained in the other case, and that the insurance company and Hilliard, personally, be made parties in this case.

In the case in the probate court, being the case to sell the lands of Strawn to pay debts, the insurance company and Hilliard answered, setting up the notes aforesaid, except those which had been paid. They set up the $10,500 note, and parts of two interest coupons, and two of the premium notes; and Hilliard alleges his $450. It appears that the two mortgages of the insurance company are anterior in date of record to Hilliard's.

Roberts and others in that case and in this answer to the cross petiton of the insurance company, alleging substantially that the mortgage given to secure the four premium notes and the notes themselves was but a trick or artifice for the purpose of compassing usury. That the insurance for which they were given, was upon the life of Edward L. Roberts, a minor seventeen years of age at the time. That Edward was the grand-son of John Strawn, and that although the policy was issued to Edward,

yet Strawn paid the premium, and it was issued for his benefit, and that the assignment of the policy made by Edward to the insurance company, (which assignment was made at the same time the policy was delivered or about that,) to be held as collateral for the payment of the mortgage notes, was but a method for Strawn taking out insurance upon the life of Roberts for his own benefit. That he had no insurable interest in the life of Edward, and the policy was void, and a wagering policy, as the insurance company well knew, and the notes were without consideration, and being merely a devise to compass usury, they became, as far as paid, payments on the principal; and the interest being thereby reduced to six per cent. instead of seven per cent., as is provided in the notes and mortgage, and that all payments made on account of the interest, in excess of six per cent., should be also applied to reduce the principal as of the time the payments were made.

The insurance company replies, denying any scheme to obtain usurious interest, and any want of consideration.

The facts, so far as they are in controversy, are about as follows:

The matter in controversy relates to the payment of $532, paid at the time the policy was issued, and the four notes for the annual premiums subsequently. The policy was issued upon the application of Edward, and although, in the application, it was stipulated that it should be payable in case of death to John Strawn, yet the policy itself is made payable to Edward. Edward never received the policy into his manual possession ; but while it was in the company's hands, and at the date of its issue, Edward assigned it to the company, as collateral for the loan. John Strawn and Edward signed the premium notes, and John Strawn executed the mortgage security.

The result of the testimony is, that there were no special matters by which it would appear that John Strawn had any insurable interest in the life of Edward. No special dependence upon Edward for support by John Strawn. No special regard as a favored grand son is shown; but the insurable interest, if it existed at all, is merely in the fact that Edward was the grand-son of John Strawn.

Now, the question is, whether a grandfather has an insurable interest in the life of his grand-son, without showing anything more. It is claimed that these notes were, without consideration, because the company knew that John Strawn had no insurable interest in the life of his grand-son.

The question resolves itself into this—that is, this is the question : Does a grand-father have an insurable interest in the life of a grand-son, so as to relieve the contract of insurance from the charge of being a wagering policy, or a wagering contract?

It is not disputed, and could not be, that the party who insures the life of another, must have an insurable interest in that life. This interest may arise from the

relationship of blood, or from pecuniary interest in another. The creditor may insure the life of a debtor. A partner the life of his co-partner. A master the life of his apprentice, or his servant hired for a definite period. In cases of strangers, there must be some financial or valuable interest to sustain the policy.

Now, it is said by the authorities cited by the defendant, and also in Bliss on Life Insurance, secs. 22 and 23, that a reasonable prospect of advantage is sufficient. And it is sufficient if such interest exists at the time the policy is taken out, although that interest may have ceased to exist before the policy terminates. Bliss on Life Insurance, sec. 30, and the authorities there cited.

Now, it is held that a parent may insure the life of his child, or the child the life of the parent. It is somewhat surprising that there are no authorities directly to be found that a grand-parent may insure the life of his grand child. There does not seem to be any cited in any works that I can find. But the supreme court of the United States, in the case of Aetna Life Insurance Company v. Frank, 94 U. S., lays down the test by which we can arrive at some certainty, it seems to me, about this matter as to whether a grand-father has sufficient interest in the life of a grand-son to insure him, so as to be free from the charge of being a wagering policy.

It says: "Where the relation is such that it constitutes a good and valid consideration in law for a gift or grant, the policy will be entirely free from any imputation of a wager."

Also, Conn. Mut. Life Ins. Co. v. Shaefer, 94 U. S., 157.

Now, tested by this rule, a grand-father has an insurable interest in the life of his grand-child, because the relationship is such that it will support—it is a good consideration for—a deed, or a gift, or a grant.

That being the test, the only question is, whether it can be subject to the charge of being a wagering contract; and it is claimed that under our statute against wagering, or betting, or gaming, it is void. But it has been held universally that these statutes do not apply to a case of this kind, but to the case of games and such things. So that applying this test, we find that even if we hold that John Strawn (and I do hold that,) did insure the life of his grand-child, Edward Roberts, for his own benefit, John Strawn paid the insurance, John Strawn made the contract with the insurance company; it was not taken upon his own life, because he was of too great an age, above the insurable age; but even upon that basis, yet that he had an insurable interest in the life of his grand-child, and that it is not for that reason without consideration. But that does not relieve the court from the responsibility of finding under these allegations as to whether this policy was not a shift for the purpose of compassing usury.

The shifts and devises which have been resorted to by men to compass usury are as various as frauds are various, and each case must be decided upon its own basis, upon its own particular facts. Now, John Strawn was an old man, 76 or 77 years old. He had a farm of 173 and 60 odd acres, making 230 or 240 acres. He owed $12,500, which was known to this company, and of which they had notice. He applied to them for a loan of $12,500. He set forth in his application the amount of land he had, and its value as he claimed it—$30,000. They sent men to inspect and appraise the land. They appointed two appraisers, who reported the value of the land at $25,000. Their agent here reported the land to be worth $20,000. They found the lands sufficient. Their terms of loan were seven per cent. And they said to John Strawn, yes, we will loan you this money, but we require you to take out a policy of insurance, and secure the payment of the premiums upon that policy for the length of the loan—five years. John Strawn himself could not be insured. But this company required, at any rate, if he could not be insured, somebody else should be, whose premiums should be secured—paid by John Strawn—that he should secure them. They took this policy upon the life of Edward Roberts—a man that could not have paid these premiums under any circumstances. They provide in this policy, that if these premium notes are not paid at any time, the policy may be void. That if the premiums are not paid, the policy shall be void without further notice. They provide also in the policy, that if the notes are not paid when due, this policy may be sold at their office in Cincinnati without any notice excepting a letter directed to Edward L. Roberts at Newark, and all that.

Now, can anybody come to any other conclusion than that this is anything but a devise to make a greater profit upon this loan? Does anybody think for a moment that this is a mere business of insurance? They require this man to take a ten year insurance policy so that the premiums are all paid up in ten years; so that in five years they get much more than the present value of the insurance. That is the value of the insurance for those five years. They know that if John Strawn fails to make the payments of the $500 notes, of the principal notes on the loan, that he must fail to pay these premium notes, and that the policy becomes void. They know that they have it in their hands in all these policies to forfeit those policies immediately, and by a sale upon which there can be no competition, and that they can buy them at their office in Cincinnati for nothing.

Now, this company says, that that is their habit of doing business. That they do not have any written rules to that effect, but that that is their habit of doing business. I say it is unconscionable, and that it is simply a scheme for the purpose of making more profit—making more interest on behalf of this company, for these loans than they otherwise could do. It is a pretense. It is a requirement which they have the power

to exact from needy men. Now, they took according to all the light that they had—they took property enough to secure this beyond any peradventure. That any man in this county who had that amount of money to loan would have loaned it at that, at that time. I do not think it can be said that they required this insuranec to be given to prosecute a legitimate insurance business. I do not know what the history of their transactions are, but I presume the history of their transactions will show that the great number of policies taken in this way, where there is a failure to pay the debt, and proceedings brougt before the court, these pol icies all amount to nothing. They would all fail.

By Judge Follett: How about if they die?

The Court: Oh, if they die—I am talking about the whole scheme. But here is this ten year policy; this amount of money paid which is much greater than the present insurance would require. It isn't a life policy, where the premiums would be less. It is nothing of that kind. Now, I know insurance companies that require insurance to be taken, but then they make it payable —some insurance companies make it payable to the beneficiaries, as the wife of the insured, and they pay it whether they—don't have it assigned as collateral, with forfeitures and all that; they pay it to the beneficiaries, and take their chances on the mortgage. That would come something nearer being legitimate; something nearer to being free from the charge of extortion. Something free from the charge of usury.

The court having indicated its views upon this matter, a decree may be taken accordingly.

I find the payments the same as they are alleged to be in the answer and cross-petition of the Union Central Insurance Company. Counsel may take that as a basis. That is, except as to this matter of usury that I have found.

J. M. Swartz and J. V. Hilliard, on behalf of Plaintiff.

Follett & Follett, J. M. Denis, and Edward Kibler, on behalf of Defendants.